UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GERALD TOBIN, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>HURON CONSULTING GROUP INC., GARY E. HOLDREN, GARY L. BURGE, and PRICEWATERHOUSE COOPERS LLP<br><br>　　　　　　Defendants. | CASE NO.: _____<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff, Gerald Tobin, brings this action individually and on behalf of all other persons or entities that purchased and/or acquired the common stock of Huron Consulting Group Inc., ("Huron" or the "Company") between April 27, 2006 and July 31, 2009, inclusive (the "Class Period"). Plaintiff's allegations are based upon, among other things: (a) the investigation conducted by and through his attorneys; (b) review and analysis of filings made by Huron with the United States Securities and Exchange Commission ("SEC"); (c) review and analysis of press releases, public statements, news articles, securities analysts' reports and other publications disseminated by or concerning Huron; and (d) other publicly available information about Huron. Most of the facts supporting the allegations contained herein are known only to the Defendants or are within their control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth in this Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities that purchased and/or acquired the common stock of Huron during the Class Period, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  The Defendants are Huron, the Company's former Chairman and Chief Executive Officer ("CEO") Gary E. Holdren ("Holdren"), its former Chief Financial Officer ("CFO") Gary L. Burge, and its outside auditor PriceWaterhouseCoopers LLP, ("PwC"). Defendants Holdren and Burge are collectively, the "Individual Defendants."   The Individual Defendants and the Company are collectively, the "Defendants".

2.      Huron provides consulting services through four operating segments: (i) Health and Education Consulting; (ii) Accounting and Financial Consulting (previously named Financial Consulting); (iii) Legal Consulting; and (iv) Corporate Consulting.

3.      The Company was founded in 2002 by approximately two dozen former Arthur Andersen partners and professionals following Andersen's demise after the Enron debacle.   It had 249 full time professionals at May 31, 2002, growing exponentially to 2,129 as of December 31, 2008.  This growth was largely attributable to multiple acquisitions principally financed by debt during the Class Period, including the following:

   a.   April 2006 -- MSGalt & Company, LLC ("Galt"), an advisory firm that designs and implements programs to improve shareholder returns.

   b.   July 2006 -- Document Review Consulting Services LLC, a consulting firm that provides document review using contract reviewers.

   c.   July 2006 -- Aaxis Technologies Inc., a provider of electronic data discovery support to litigation teams and corporate counsel.

d.  January 2007 -- Wellspring Partners LTD, a management consulting firm specializing in integrated performance improvement services for hospitals and health systems.

e.  January 2007 -- Glass & Associates, Inc., a turnaround and restructuring consulting firm.

f.  July 2007 -- Callaway Partners, LLC, a professional services firm that specializes in finance and accounting projects, financial reporting, internal audit and controls, and corporate tax solutions.

g.  July 2008 -- Stockamp & Associates, Inc., a management consulting firm specializing in helping hospitals and health systems optimize their financial and operational performance.

4.      As a result of Huron's acquisitions and the expansion of the Company's business, the Company's reported income also appeared to grow at a dramatic rate, quadrupling from approximately $10 million in 2004 to approximately $41 million in 2008.   In fact, as the Company admitted at the end of the Class Period, Huron's growth in reported income after 2006 was almost entirely the result of phony accounting.

5.      On Friday, July 31, 2009, after the markets closed, the Company issued a press release which disclosed that Huron's reported income, earnings per share ("EPS") and earnings before interest, taxes, depreciation and amortization ("EBITDA") for each of the years 2006 through the first quarter of 2009 were materially overstated, that the Company expected to restate its financial results for these periods and that the Company's Chairman, CEO and CFO and Chief Accounting Officer were leaving the Company without severance.   The expected restatement would reduce reported income by $57 million and EPS by $2.99, as follows:

| | Net Income (in millions) | | EPS | | |
| | Reported | Restated | Reported | Restated | Difference |
|---|---|---|---|---|---|
| **2006** | 27 | 23 | $1.54 | $1.32 | ($0.22) |
| **2007** | 42 | 24 | $2.33 | $1.35 | ($0.98) |
| **2008** | 41 | 10 | $2.13 | $0.53 | ($1.60) |
| **1Q09** | 10 | 6 | $0.51 | $0.32 | $0.19 |
| | $120 | $63 | $6.51 | $3.52 | $2.99 |

6.     This announcement caused the price of Huron stock to fall 69%, from a closing price of $44.35 per share on Friday, July 31, 2009 to a closing price of $13.69 per share on Monday, August 3, 2009, a decline of $30.66 per share, on extraordinary volume of 31.7 million shares.

7.     This massive restatement was caused by improper post-acquisition accounting for four of the Company's acquisitions made from 2006 to 2008.  Under the terms of the acquisition agreements the Company was obligated to make post-acquisition payments to the sellers of the acquired companies based on the post-acquisition performance of the acquired businesses, known as "earn-out" payments.  The Company's annual reports filed with the SEC on Forms 10-K for its 2006, 2007 and 2008 fiscal years stated that these earn-out amounts would be accounted for as additions to the purchase prices of the companies and adjustments to goodwill which would not affect reported income.  Indeed, this is manner in which the Company purported to account for earn-out payments from 2007, when the Company issued its 2006 audited financial statements, through the first quarter of 2009.

8.     However, instead of representing additional purchase price for the acquired companies, these earn-out payments were "reallocated" by selling shareholders of the acquired companies to Huron's employees who agreed to continue their employment with the acquired companies and were responsible for the performance that gave rise to the right to the additional

consideration for the "reallocations." As Huron stated in its announcement of the restatement, that meant that under generally accepted accounting principles ("GAAP") those amounts were required to be accounted for by Huron as compensation expense, which reduces income, rather than as an acquisition cost, which does not. What Huron had done was to bolster its reported income by avoiding the associated compensation reporting expense.

9. As one commentator, Tyler Durden of Seeking Alpha, put it, "the company was guilty of some mega shady compensation arrangements in its recent acquisition spree, trying to mask acquired earnings as organic growth."

10. Gregory Zuckerman of *The Wall Street Journal*, remarked in an August 5, 2009 article entitled "Huron Takes Big Hit As Accounting Falls Short":

> **A dose of irony is that Huron makes its money providing financial and legal consulting services, including forensic-style investigative work.**

(Emphasis added.) The article quotes analyst Sean Jackson of Avondale Partners, who dropped his rating on the Company's stock from the equivalent of "buy" to "hold," expressing his disbelief that the Defendants did not know about the Company's accounting improprieties, stating:

> **One of their businesses is forensic accounting—they're experts in this…Investors are saying "These guys had to know that what they had to know on the accounting perspective, or should have known."**

(emphasis added.)

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337 and 1367.

12.    The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. § 240.10b-5).

13.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) and (c).  Substantial acts in furtherance of the alleged fraud and/or its effects, including the preparation and dissemination to the investing public of materially false and misleading financial statements, occurred in this District.  Additionally, the Company maintains its principal executive offices in this Judicial District.

14.    In connection with the acts, omissions and other wrongs complained of herein, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

15.    Plaintiff, Gerald Tobin, purchased the publicly traded common stock of Huron at artificially inflated prices during the Class Period, as set forth in the certification attached hereto, and has suffered damages as a result of the disclosure of the wrongful acts of Defendants as alleged herein.

16.    Defendant Huron is a Delaware corporation that maintains its principal executive offices at 550 West Van Buren Street, Chicago, Illinois.  Huron was formed in March 2002 and

commenced operations in May 2002. In October 2004, Huron completed its initial public offering and became a publicly traded company.

17.     Defendant Holdren was, at all relevant times, CEO and Chairman of the Board of Directors of Huron until his resignation on July 31, 2009. Until May 21, 2009, when he was replaced by David M. Slade, he was also the President of Huron. Holdren was highly motivated to engage in the misconduct alleged herein in order to profit from the sale of artificially inflated shares of Huron stock. During the Class Period, Holdren sold approximately 292,726 shares of his personally held Huron stock for proceeds of approximately $16,852,010. Holdren reviewed, approved and signed certain of Huron's false and misleading SEC filings during the Class Period and participated in Huron conference calls with securities analysts in which the Company's false and misleading financial results were presented and discussed.

18.     Defendant Burge was, at all relevant times, CFO of Huron until his resignation on July 31, 2009. Burge was highly motivated to engage in the misconduct alleged herein in order to profit from the sale of artificially inflated shares of Huron stock. During the Class Period, Burge sold approximately 9,443 shares of his personally held Huron stock for proceeds of approximately $444,381. Burge reviewed, approved and signed certain of Huron's false and misleading SEC filings during the Class Period, and participated in Huron conference calls with securities analysts in which the Company's false and misleading financial results were presented and discussed.

19.     Defendant PwC offers auditing and accounting services and provides, corporate reporting, financial accounting, sustainability reporting, internal audit, and regulatory compliance and reporting services. PwC acted as the Company's outside auditor during the Class Period. PwC audited Huron's false and misleading financial statements contained in the

Company's Forms 10-K for the years ended December 31, 2005, 2006, 2007, and 2008 and PwC issued materially false and misleading opinions in those statements.

20.    During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Huron, was privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.    Each of the above officers of Huron, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

22.    As officers and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the provisions of the federal securities laws, the Individual

Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Huron, the Individual Defendants had access to the adverse undisclosed information about Huron's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Huron and its business issued or adopted by the Company materially false and misleading.

24.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the

Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

25.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Huron's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.    The scheme (i) deceived the investing public regarding Huron's business, operations, management and the intrinsic value of Huron's common stock; and (ii) caused Plaintiffs and other members of the Class to purchase Huron's common stock at artificially inflated prices.

## DEFENDANTS FALSE AND MISLEADING STATEMENTS

26.    On February 22, 2007, Huron issued a press release which set forth the Company's reported financial results for 2006 and the fourth quarter of that year, which quoted the statement of Defendant Holdren that "[w]e are pleased by Huron's strong growth this year…."  The February 22, 2007 press release reported that 2006 diluted EPS increased to $1.54 per share, an increase of approximately 39% from $1.05 diluted EPS in 2005.  The press release reported that the Company's 2006 net income was $26.7 million, up $8.9 million and 50% from reported net income of $17.8 million for 2005.  The February 22 press release also reported that the Company's 2006 EBITDA increased 54.3% to 58.9% or 20.4% of revenues, compared to $38.2 million or 18.4% of revenues in 2005.

27.    On the same day, February 22, 2007, Huron conducted a publicly accessible conference call with securities analysts in which Defendants Holdren and Burge discussed the Company's reported 2006 and fourth quarter 2006 financial results as reported in the February 22 press release.  In the February 22, 2007 conference call, Defendant Burge told analysts that in 2006 EBITDA increased 54% to $59 million from $38 million a year ago.  "Our EBITDA and

adjusted EBITDA margins each improved 200 basis points over the last year.  Diluted EPS came in at $1.54 compared to $1.05 last year."

28.     On February 22, 2007, Huron filed with the SEC its Annual Report on Form 10-K (the "2006 10-K"), which was signed by Defendants Burge and Holdren.  The 2006 10-K reiterated the financial information concerning the Company's 2006 reported income, EBITDA and EPS that appeared in the February 22, 2007 press release and was discussed in the Company's conference call on the same day.  In addition, the 2006 10-K reported that the Company had acquired other consulting companies pursuant to agreements which required Huron to pay "additional purchase consideration if certain performance targets are met" over a period of several years after the acquisition, which "will be recorded as additional purchase price and an adjustment to goodwill."

29.     Filed with Huron's 2006 10-K were certificates require by Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Holdren and Burge which, as required by Section 302, stated:

1.     I have reviewed this annual report on Form 10-K of Huron Consulting Group, Inc.

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-(15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

30.    In addition, filed on February 22, 2007 with Huron's 2006 10-K were certifications signed by Defendants Holdren and Burge as required by Section 906 of the SOX, which stated, with respect to the 2006 10-K:

1.    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company for the periods presented therein.

31.    In response to Defendants' February 22, 2007 announcements the market price of Huron Stock increased sharply from a closing price of $56.04 per share on February 21, 2007 to a closing price of $60.37 per share on February 22, 2007 on volume of 713,900 shares, and increased further to a closing price of $65.15 per share on February 23, 2007.

32.    The foregoing statements in Huron's 2006 10-K were materially false and misleading because, as discussed below, Defendants admitted at the end of the Class Period, 2006 net income and EBITDA were overstated by $14 million, Huron's 2006 EPS was overstated by $0.22 per share because the Company accounted for payments of $4 million of additional consideration for acquired companies as additions to the purchase prices in the form of goodwill, which does not affected reported income, when the amounts paid were based on the performance

of those companies were "redistributed" by selling shareholders of the acquired companies to Company employees "dependent on continued employment with Huron or on the achievement of personal performance measures" which must be treated for accounting purposes as compensation paid by the Company, which reduces net income, EPS and EBITDA.

33.    On February 20, 2008, Huron issued a press release which announced the Company's reported financial results for 2007 and the fourth quarter of 2007.  The February 20, 2008 press release reported:

> • Diluted earnings per share for the full year 2007 were $2.32 compared to $1.54 for the full year 2006.

> *    *    *

> Net income was $41.9 million, or $2.32 per diluted share, for the full year ended December 31, 2007 compared to $26.7 million, or $1.54 per diluted share, for the comparable period last year.

> *    *    *

> Full year 2007 EBITDA increased 84.9% to $108.9 million, or 21.6% of revenues, compared to $58.9 million, or 20.4% of revenues, in the comparable period last year. Adjusted EBITDA, which excludes share-based compensation expense and costs associated with a secondary offering of the Company's common stock in the first quarter of 2006, increased 85.7% to $128.8 million, or 25.5% of revenues, compared to $69.3 million, or 24.0% of revenues, in the same period last year.  [Footnotes omitted.]

34.    On February 20, 2008, Defendants Holdren and Burge conducted a publicly accessible conference call with securities analysts in which they reiterated the financial results reported in the February 20, 2008 press release emphasizing the Company's improved financial performance.

35.    Also on February 20, 2008, the Company filed with the SEC its 2007 Annual Report on Form 10-K (the "2007 10-K"), which was signed by Defendants Holdren and Burge,

and which reported the same information with respect to 2007 net income, EBITDA, and EPS as the February 20, 2008 press release.

　　　36.　　　The Company's 2007 10-K also disclosed information about Huron's acquisitions of other consulting companies, agreements regarding post-acquisition payments and accounting for those payments, as follows:

> In April 2007, we acquired substantially all of the assets of MSGalt & Company, LLC, a specialized advisory firm that designs and implements corporate-wide programs to improve shareholder returns....The aggregate purchase price of this acquisition was approximately $43.3 million...
>
> 　　　*　　*　　*
>
> **Additional purchase consideration may be payable to the selling shareholders if specific financial performance targets are met over a four-year period. Such amounts will be recorded as additional purchase price and an adjustment to goodwill.**
> 　　　*　　*　　*
>
> In July we acquired Document Review Consulting Services LLC
>
> 　　　*　　*　　*
>
> In January 2007, we acquired Wellspring Partners LTD, a management consulting firm specializing in integrated performance improvement services for hospitals and health systems...The aggregate purchase price of this acquisition was approximately $135.1 million...**Additional purchase consideration may be payable to the selling shareholders if specific financial performance targets are met over a five-year period. Such amounts will be recorded as additional purchase price and an adjustment to goodwill.**
>
> 　　　*　　*　　*
>
> Also in January 2007, we acquired Glass & Associates, Inc., a turnaround and restructuring consulting firm that provides advise and leadership to troubled businesses in the United States and Europe...The aggregate purchase price of this acquisition was approximately $35.2 million...**Additional purchase consideration may be payable to the selling shareholders if specific financial performance targets are met over a four-year period. Such amounts will be recorded as additional purchase price and an adjustment to goodwill....**
>
> 　　　*　　*　　*

In July 2008, we acquired Stockamp & Associates, Inc., a management consulting firm specializing in helping high-performing hospitals and health systems optimize their financial operational performance....

\* \* \*

The aggregate purchase price of this acquisition was approximately $229.3 million...For the period beginning on the closing date and ending on December 31, 2001, **additional purchase consideration may be payable to the selling shareholders if specific financial performance targets are met. Such amounts will be recorded as additional purchase price and an adjustment to goodwill.**

(Emphasis added.)

37.    Further, Huron's 2007 10-K revealed that "the failure to retain key acquired personnel" may result in an inability "to achieve the financial, operational and other benefits we anticipate from any acquisition."

38.    Filed with the SEC on February 20, 2008 with Huron's 2007 10-K were the same forms of certificates pursuant to Section 302 and 908 of the SOX signed by Holdren and Burge as were filed with Huron's 2006 10-K.

39.    The foregoing statements by Defendants in the 2007 10-K were materially false and misleading because, as discussed below, Defendants admitted at the end of the Class Period that Huron's growth in net income, EPS and EBITDA reported by them was essentially non-existent.  Instead of the $42 million net income reported for 2007 Defendants admitted that Huron's 2007 net income was actually only $24 million, a mere $1 million higher than the Company's $23 million actual net income for 2006.  Huron's restated 2007 EPS was $1.35 per share, versus reported 2007 EPS of $2.35 per share, and was virtually the same as the Company's restated 2006 EPS of $1.32 per share.  The Company's 2007 EBITDA was similarly reduced.  The reason for these reductions was the same as for the reductions of 2006 income, EPS and EBITDA – that Defendants accounted for payments of additional consideration for

acquired companies as additions to the purchase prices in the form of goodwill, which does not

affected reported income, when the amounts paid were based on the performance of those

companies were "redistributed" by selling shareholders of the acquired companies to Company

employees "dependent on continued employment with Huron or on the achievement of personal

performance measures" which must be treated for accounting purposes as compensation paid by

the Company, which reduces net income, EPS and EBITDA.

40.    On February 24, 2009, Huron issued a press release announcing the Company's

financial results for 2008 and the fourth quarter of that year.  The February 24, 2009 press

release reported the following financial results:

> •Diluted earnings per share for the full year 2008 was $2.13 compared to
> $2.32 for the full year 2007.
>
> *    *    *
>
> Net income was $40.7 million, or $2.13 per diluted share, for the full year
> ended December 31, 2008 compared to $41.9 million, or $2.32 per diluted
> share, for the comparable period last year.
>
> *    *    *
>
> Full year 2008 EBITDA increased 11.6% to $121.6 million, or 19.8% of
> revenues, compared to $108.9 million, or 21.6% of revenues, in the
> comparable period last year. Adjusted EBITDA, which excludes share-
> based compensation expense and restructuring charges, increased 17.1%
> to $150.7 million, or 24.5% of revenues, compared to $128.8 million, or
> 25.5% of revenues, in the same period last year. [Footnotes omitted.]

41.    On February 24, 2009, Defendants Holdren and Burge conducted a publicly

accessible conference call with securities analysts in which they reiterated the financial results

that were reported in the February 24, 2009 press release.  During this conference call, Defendant

Burge told analysts that the Company mitigated revenue shortfalls and other costs and expenses

"through our variable labor and compensation cost models as well as SG&A cost management."

In fact, as set forth herein, $31 million that was paid to employees of acquired companies was not included in the Company's financial statements or its variable cost models or Selling, General & Administrative cost management ("SG&A").

42.    Also on February 24, 2009, Huron filed with the SEC its 2008 Annual Report on Form 10-K (the "2008 10-K") that was signed by Defendants Holdren and Burge.  The 2008 10-K reiterated the financial results reported in the February 24, 2009 press release, repeated the information about acquired companies that was included in the 2007 10-K and added the following information about the 2008 acquisition of Stockamp & Associate, Inc.:

> In July 2008, we acquired Stockamp & Associate, Inc., a management consulting firm specializing in helping high-performing hospitals and health systems optimize their financial and operational performance.
>
> *    *    *
>
> For the period beginning on the closing date and ending on December 31, 2011, **additional purchase consideration may be payable to the selling shareholders if specific financial performance targets are met.  These payments are not contingent upon the continuing employment of the selling shareholders. Such amounts will be recorded as additional purchase consideration and an adjustment to goodwill.**

(Emphasis added.)

43.    Filed with the 2008 10-K were the substantially identical certificates pursuant to Sections 302 and 908 of SOX signed by Defendants Holdren and Burge that accompanied the 2006 10-K and the 2007 10-K.

44.    As set forth herein, Defendants admitted that more than 75% and $31 million of the Company's reported 2008 net income did not exist because that amount was required to be deducted from the Company's reported income   This was the result of reporting as additions to goodwill (which did not affect reported income) $31 million paid by Huron to selling shareholders of four acquired companies which was "redistributed" to Huron employees based

on "continuing employment with Huron or ... the achievement of personal performance." As Defendants admitted, under GAAP that amount should have been treated as compensation expense on the Company's 2008 financial statements, reducing its 2008 net income from the reported $41 million to the restated $10 million. This resulted in a reduction of EPS from the reported $2.13 per share to the restated $0.53 per share. The reduction of 2008 EBITDA under the planned restatement is proportionate to the reduction of net income.

45.    The Company's interim financial statements were materially false and misleading as a result of the improper accounting treatment for earn-out payments that were "redistributed" to Huron employees, as described herein, which overstated net income, EPS and EBITDA, which was carried forward and overstated on each of the financial statements contained in the Company's quarterly reports on Forms 10-Q filed with the SEC on April 27, 2006, August 8, 2006, November 2, 2006, May 3, 2007, August 7, 2007, October 31, 2007, May 6, 2008, August 5, 2008 and October 30, 2008, and the quarterly earnings releases issued by the Company on April 27, 2006, August 8, 2006, November 2, 2006, May 3, 2007, August 7, 2007, October 31, 2007, May 6, 2008, August 5, 2008 and October 30, 2008.

46.    On April 30, 2009, Huron issued a press release announcing its financial results for the first quarter of 2009. The April 30, 2009 press release reported:

• Diluted earnings per share for Q1 2009 was $0.51 compared to $0.56 in Q1 2008.

*    *    *

Net income was $10.3 million, or $0.51 per diluted share, for the first quarter of 2009 compared to $10.2 million, or $0.56 per diluted share, for the same period last year.

*    *    *

First quarter 2009 earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 13.6% to $29.3 million, or 18.0% of revenues, compared to $25.8 million, or 18.5% of revenues, in the comparable quarter last year. Adjusted EBITDA, which excludes share-based compensation expense, rose 11.5% to $35.9 million, or 22.0% of revenues, compared to $32.2 million, or 23.1% of revenues, in the comparable quarter last year. [Footnotes omitted.]

47.     On April 30, 2009, Defendants Holdren and Burge conducted a publicly accessible conference call with securities analysts in which they reiterated the financial results that were reported in the April 30, 2009 press release. These results were also repeated in Huron's quarterly report on Form 10-Q for the first quarter of 2009, which was signed by Burge and filed with the SEC on April 30, 2009.

48.     The quarterly report on Form 10-Q for the quarter ending March 31, 2009, that was filed with the SEC on April 30, 2009 was accompanied by the required certificates pursuant to Sections 302 and 906 of the SOX signed by Defendant Holdren each in the form set forth herein.

49.     As the Huron Defendants admitted at the end of the Class Period, the Company's reported net income for the first quarter of 2009 was overstated by more than 65%, in that Huron's actual income for the quarter was only $6 million, compared with the $10 million net income reported by the Company. As the Huron Defendants admitted, Huron's first quarter of EPS was similarly overstated. Actual EPS were $0.32 per share, while reported EPS were $0.51 per share. As a result all of the Huron Defendants representations about those financial results and Defendants Holdren's and Burge's SOX certificates relating to the Company's financial reporting for the quarter were materially false and misleading.

## DEFENDANT PWC'S FALSE AND MISLEADING STATEMENTS

50.    With respect to Huron's 2006financial statements, PwC represented, in its Report

of Independent Registered Public Accounting Firm dated February 22, 2007 and included in the

2006 10-K, the following:

> We have completed integrated audits of Huron Consulting Group Inc.'s 2006 and
> 2005 consolidated financial statements and of its internal control over financial
> reporting as of December 31, 2006, and an audit of its 2004 consolidated financial
> statements in accordance with the standards of the Public Company Accounting
> Oversight Board (United States).  Our opinions, based on our audits, are presented
> below.

> *Consolidated financial statements*

> In our opinion, the consolidated financial statements listed in the accompanying
> index present fairly, in all material respects, the financial position of Huron
> Consulting Group Inc. and its subsidiaries at December 31, 2006 and 2005, and
> the results of their operations and their cash flows for each of the three years in
> the period ended December 31, 2006 in conformity with accounting principles
> generally accepted in the United States of America.  These financial statements
> are the responsibility of the Company's management.  Our responsibility is to
> express an opinion on these financial statements based on our audits.  We
> conducted our audits of these statements in accordance with the standards of the
> Public Company Accounting Oversight Board (United States).  Those standards
> require that we plan and perform the audit to obtain reasonable assurance about
> whether the financial statements are free of material misstatement.  An audit of
> financial statements includes examining, on a test basis, evidence supporting the
> amounts and disclosures in the financial statements, assessing the accounting
> principles used and significant estimates made by management, and evaluating
> the overall financial statement presentation.  We believe that our audits provide a
> reasonable basis for our opinion.

> As discussed in Note 2 to the consolidated financial statements, the Company
> changed the manner in which it accounts for share-based compensation in 2006.

> *Internal control over financial reporting*

> Also, in our opinion, management's assessment, included in Management's Report
> on Internal Control Over Financial Reporting appearing under Item 9A, that the
> Company maintained effective internal control over financial reporting as of
> December 31, 2006 based on criteria established in *Internal Control -- Integrated
> Framework* issued by the Committee of Sponsoring Organizations of the
> Treadway Commission (COSO), if fairly stated, in all material respects, based on

those criteria.  Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on criteria established in *Internal Control -- Integrated Framework* issued by COSO.  The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting.  Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit.  We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.  An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances.  We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.  A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records, that, in reasonable detail, acccurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding the prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.  Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies of procedures may deteriorate.

51.    PwC issued nearly identical unqualified audit reports with respect to Huron's financial statements for 2007 and 2008, in letters dated February 19, 2008 and February 24,

2009, respectively.  These audit reports were included in the Company's 2007 and 2008 Forms 10-K.

52.    PwC's audit reports and approval of the financial results were false and misleading due to its willful ignorance of "red flags" of side-agreements concerning the payment of earn-outs, in violation of generally accepted auditing standards ("GAAS"), and because Huron's financial statements were not prepared in conformity with GAAP so that issuing the reports or approving Huron's financial results was in violation of GAAS and SEC rules.  PwC knew its reports and approval of the financial statements would be relied upon by the Company as well as by present and potential investors in Huron's securities.

## THE TRUTH BEGINS TO EMERGE

53.    On July 31, 2008, after the markets closed, Huron issued a press release entitled, "Huron Consulting Group Announces Intention to Restate Financial Statements and Management Changes; The Company Provides Preliminary Second Quarter and Estimated Full Year 2009 Revenues," announcing, among other things, that: (i) in at least four acquisitions, Huron had improperly accounted for earn-out payments that were paid to employees who were not parties to the original sale of the acquired businesses and that such payments were "redistributed" by selling shareholders oof the acquired businesses to Huron employees based on their continued employment by Huron and/or personal performance measures rather than an ownership interest in the businesses acquired by Huron, and therefore, under GAAP Huron should have accounted for these payments as compensation expenses, but instead had been adding these sums to the purchase prices of the acquisitions in the form of goodwill; (ii) investors could not longer rely on the Company's previously issued financial statements for

2006, 2007, 2008 and the first quarter of 2009, which the Company plans to restate; and (iii) the

Individual Defendants were immediately resigning without severance stating:

> **•Company to restate financial statements for the fiscal years 2006, 2007 and 2008 and Q1 2009.**
>
> •Restatement pertains to ... how payments received by the sellers of certain acquired businesses were subsequently redistributed among themselves and to other select Huron employees.
>
> **•Total estimated impact on net income and EBITDA for all restated periods of $57 million.**
>
> **Huron ... today announced that the Company will restate its financial statements for the fiscal years 2006, 2007 and 2008 and the first quarter of 2009, to correct the Company's accounting for certain acquisition-related payments received by the sellers in connection with the sale of certain acquired businesses that were subsequently redistributed among themselves and to other select Huron employees. As a result, the historical financial statements for these periods should no longer be relied upon. The restatement items are non-cash charges with a total estimated impact on net income and EBITDA for all restated periods of $57 million....** In addition, the Company announced management changes, including the appointment of George Massaro as Non-Executive Chairman of the Board and James H. Roth, a founder of the Company, as Chief Executive Officer. Both appointments follow the resignation of Gary E. Holdren as Chairman of the Board and Chief Executive Officer.
>
> **Financial Statement Restatement**
>
> The restatement relates to four businesses that the Company acquired between 2005 and 2007 (the "Acquired Businesses"). Pursuant to the purchase agreements for each of these acquisitions, payments were made by the Company to the selling shareholders upon closing of the transaction and also, in some cases, upon the Acquired Businesses achieving specific financial performance targets over a number of years ("earn-outs"). These payments are collectively referred to as "acquisition-related payments."
>
>      *   *   *
>
> **[T]he selling shareholders of the Acquired Businesses:**
>
> **1) Redistributed portions of their acquisition-related payments among themselves in amounts that were not consistent with their ownership percentages ("Shareholder Payments") at the date of acquisition by Huron.**

Such payments were dependent, in part, on continuing employment with Huron or on the achievement of personal performance measures; or

2) Redistributed portions of their acquisition-related payments to certain Company employees ("Employee Payments") who were not selling shareholders of the Acquired Businesses. Such payments were dependent on continuing employment with Huron or on the achievement of personal performance measures.

Under generally accepted accounting principles, including guidance promulgated by the U.S. Securities and Exchange Commission ("SEC"), actions of economic interest holders in a company may be imputed to the company itself. As the selling shareholders meet the criteria of economic interest holders in Huron, the Shareholder Payments and the Employee Payments are imputed to the Company.... As a result, both the Shareholder Payments and the Employee Payments are required to be reflected as non-cash compensation expense of the Company.

\*    \*    \*

Effective August 1, 2009, the selling shareholders of two of the Acquired Businesses each amended certain agreements related to the earn-out payments to provide that future earn-out payments will be distributed only to the applicable selling shareholders and only in accordance with their equity interests at the date of the acquisition by Huron and no further Shareholder Payments or Employee Payments will be made. As a result of these amendments, the Company expects to incur a moderate increase in cash compensation expense in future periods. However, the inquiry is ongoing, and there can be no assurance that additional information will not be discovered that will require these payments to continue to be accounted for as non-cash compensation expense, which would be material to results of operations through 2011. The earn-out payments for one of the Acquired Businesses are payable through March 31, 2010, and the earn-out payments for a second Acquired Business are payable through December 31, 2011. There are no additional earn-out obligations related to the other two Acquired Businesses.

\*    \*    \*

As a result of the matters identified above, management is currently in the process of reviewing its internal control over financial reporting and expects that it will identify one or more material weaknesses in the Company's internal control over financial reporting. The Company will also assess its disclosure controls and procedures.

\*    \*    \*

**The foregoing uncertainties also could impact the Company's estimated revenues for the second quarter of 2009 and revenue guidance for the full year 2009, provided below.**

\* \* \*

**The Company expects to file amended reports with respect to the periods in question, as well as its Quarterly Report on Form 10-Q for the quarter ended June 30, 2009, as soon as practicable**

\* \* \*

**Wayne Lipski, previously Chief Accounting Officer, will be leaving the Company.**

\* \* \*

**Holdren has resigned as Chairman and Chief Executive Officer of the Company effective July 27, 2009 and will leave the Company at the end of August.**

(Emphasis added.)

54.     On this news, the price of Huron stock plummeted 69%, from a closing price of $44.35 per share on Friday, July 31, 2009 to a closing price of $13.69 per share on Monday, August 3, 2009, representing a single-day decline of $30.66 per share, on unusually heavy volume of 31.7 million shares traded.

55.     On August 3, 2009, Huron issued a press release entitled "Huron Consulting Group Provides Restatement-Related Q&A," in which the Company provided additional information regarding its planned restatement, including the following:

> Huron … announced on July 31, 2009 that the Company will restate its financial statements for the fiscal years 2006, 2007 and 2008 and the first quarter of 2009 to correct the Company's accounting for certain acquisition-related payments received by the sellers in connection with the sale of certain acquired businesses that were subsequently redistributed among themselves and to other select Huron employees.

The restatement relates to four businesses that the Company acquired between 2005 and 2007 (the "Acquired Businesses"). Pursuant to the purchase agreements for each of these acquisitions, payments were made by the Company to the selling shareholders upon closing of the transaction and also, in some cases, upon the Acquired Businesses achieving specific financial performance targets over a number of years ("earn-outs").

*     *     *

**Why is a restatement required?**

The Shareholder Payments and the Employee Payments are in substance a second and separate transaction from the Company's acquisition of the Acquired Businesses, which resulted in a separate non-cash accounting entry that was not recorded by the Company.

Under GAAP, the selling shareholders are economic interest holders of Huron due to their ability to earn additional consideration from Huron. As such, when the selling shareholders pay a portion of their closing proceeds or earn-outs to Huron employees who were not selling shareholders or redistribute those proceeds among themselves based on employment or performance-based criteria, under GAAP, these payments are viewed as resulting from service that is assumed to have benefited the Company. Therefore, these payments are deemed to be non-cash compensation expense for the Company, and the selling shareholders are deemed to have made a capital contribution to the Company.

*     *     *

**Who were the certain Company employees that received the "Employee Payments"?**

The Company employees who received the Employee Payments were client-serving and administrative employees of the respective acquired businesses at the date of the acquisition by Huron and similar employees hired by the respective acquired business after the date of such acquisitions....

**DEFENDANTS' ACCOUNTING FRAUD**

56.     As referenced above, Defendants caused Huron to falsely state the Company's earnings, and to violate GAAP and SEC rules by overstating Huron's net income and earnings and falsely certifying pursuant to the SOX that Huron had effective internal and financial controls.

57.    SEC Regulation S-X (17 C.F.R. §210.4-01(a) (1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements.

58.    Huron's financial statements violated GAAP because, among other things, the Company improperly accounted for earn-outs that were supposed to be based on the performance of acquired business units after the transaction was completed and paid as part of the purchase price for the businesses which were actually paid for services performed by Huron employees. Such payments were based on the performance of the employees who remained at Huron, and not based on the ownership interests of those employees in the businesses that were sold to Huron.  Huron was required to account for these employee compensation payments as noncash operating expenses of the Company, but instead it added these amounts to the purchase price of the acquisition and accounted for them as increases in goodwill.  This improper method of accounting for compensation payments had the effect of increasing reported net income, EPS and EBITDA.

59.    As result of Huron's improper accounting practices with respect to earn-out payments, it has announced that it expects to restate its financial statements for the years ended December 31, 2006, 2007 and 2008 and the first quarter of 2009.  The fact that Huron will restate its financials is an admission that:

a.   the financial results originally issued during the Class Period and its public statements regarding those results were materially false and misleading;

    b.  the financial statements reported during the Class Period were incorrect based on information available to Defendants at the time the results were originally reported; and

    c.  the financial statements can no longer be relied upon as being accurate.

60.    The fact that Huron will restate its financial statements is an admission that the financial statements originally issued were false and that the overstatement of its net income, EPS and EBITDA was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Huron was to correct for material errors in its previously issued financial statements *See* APB No. 20, ¶¶7-13. Moreover, SFAS No. 154, *Accounting Changes and Error Corrections,* states: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements." SFAS No. 154. Thus, GAAP provides that financial statements should be restated in order to correct an error in previously issued financial statements. Huron's restatements are due to improper accounting treatment for earn-out payments made in connection with its acquisitions. Thus, the restatements are admissions by Huron that its previously issued financial results and its public statements regarding those results were false.

61.    Due to the accounting improprieties alleged herein, Huron presented its financial results and statements in a manner that violated GAAP, including violation of the following fundamental accounting principles:

    a.  The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting

Standards Board Statement of Financial Accounting Concepts "FASCON" No. 1, ¶34);

b.  The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources and effects of transactions, events and circumstances that change resources and claims to those resources (FASCON No. 1, ¶40);

c.  The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASCON No. 1, ¶ 50);

d.  The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least in part, on an evaluation of an enterprise's past performance (FASCON No. 1, ¶42);

e.  The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant, is a notion that is central to accounting (FASCON No. 2 ¶¶ 58-59);

    f.  The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASCON No. 2, ¶79); and

    g.  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASCON No. 2, ¶¶95, 97).

62.    Further, the undisclosed adverse information concealed by Defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## PWC PARTICIPATED IN ISSUING FALSE FINANCIAL STATEMENTS

63.    Since at least 2003, PwC was engaged to provide Huron independent auditing and accounting services and PwC was engaged to examine and report on Huron's financial statements at all times relevant to the Class Period. PwC was involved in Huron's accounting for its acquisitions and, as a result, a large portion of its fees were generated from services other than auditing, such as performing due diligence reviews related to mergers and acquisitions, accounting consultations and audits in connection with acquisitions, and internal control reviews. For example in 2007, PwC earned 36% of its fees from auditing Huron's financial statements, while generating nearly 40% of its fees from services related to its acquisitions and internal controls. PwC earned the remaining 24% of its fees by providing tax services to Huron. As a

result of the extensive scope of services provided by PwC, PwC personnel were intimately familiar with Huron's business, and in particular, the Company's accounting for acquisitions.

64.    GAAS, as set forth in AU §326, *Evidential Matter*, requires auditors to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit:

> In evaluating evidential matter, the auditor considers whether specific audit objectives have been achieved.  The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation.  In designing audit procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of accounting other than generally accepted accounting principles.  In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements.  To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion.

AU §326.25.

65.    PwC's responsibility, as Huron's independent auditor, was to obtain "[s]ufficient competent evidential matter ... to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles."  AU §§110.01, 150.02.

66.    In violation of GAAS, and contrary to the representations in its report on Huron's financial statements, PwC did not obtain sufficient, competent evidential matter to support Huron's assertions regarding its accounting for its acquisitions or its revenue recognition.

67.    As one of the largest audit firms in the world, PwC was well aware of the strategies, methods and procedures required by GAAS to conduct a proper audit. Also, PwC knew of (or was reckless in disregarding) the audit risks inherent at Huron and in the industries in which Huron operated because of the comprehensive services it provided to Huron and its experience with many other clients. In connection with Huron's operations, PwC had virtually limitless access to information concerning the Company's true operations because:

- PwC had been Huron's auditor since at least 2003;

- PwC representatives were frequently present at Huron's headquarters and divisions;

- PwC had frequent conversations with Huron management and employees about the Company's operations and financial statements;

- PwC audited and reviewed Huron's financial statements at all relevant times and knew, should have known, or recklessly disregarded that Huron's financial statements were not accurate or prepared in compliance with GAAP or GAAS; and

- PwC provided Huron with due diligence services and accounting consultations and audits related to its acquisitions.

68.    PwC's intentional failure to comply with GAAS in PwC's performance on the Huron audits rose to the level of deliberate recklessness, as the following paragraphs demonstrate. PwC abandoned its role as independent auditor by turning a blind eye to each of the above indications of improper accounting, including Huron's accounting for its acquisitions and its revenue recognition. Despite this knowledge, PwC did not insist upon adjustments to Huron's audited financial statements. Pursuant to GAAS, PwC should have issued a qualified or adverse report, or it should have insisted that Huron comply with GAAP. Furthermore, PwC should have refused to approve Huron's quarterly financial results.

69.     As to its audits of Huron, PwC was required to perform its audits in conformity with the Statement of Accounting Standard ("SAS") No. 82, *Consideration of Fraud in a Financial Statement Audit*, which includes auditing for misstatements arising from the misappropriation of assets.  PwC failed to comply with SAS no. 82 in its audit of Huron's financial statements.  During the course of its audit of Huron's financial statements, PwC knew or was reckless in failing to have discovered the irregularities which caused Huron's financial results to be misstated for years.  The very risk of fraud was a potential reportable condition which should have been reported to the audit committee and possibly senior management.

70.     PwC's failure to adequately perform its audit procedures to identify the improprieties alleged herein and its failure to report the problems permitted the accounting irregularities and improprieties to continue over a period of several years, leading to false and misstated financial statements, a significant restatement and an inquiry by the SEC.

71.     Furthermore, PwC recklessly disregarded numerous red flags that should have alerted PwC that Huron's financial statements were materially false and misleading.  Many of the red flags PwC ignored mirrored the risk factors PwC was required to consider according to AU §316, *Consideration of Fraud in a Financial Statement Audit,* including:

- Unusually rapid growth or profitability, especially compared with that of other companies in the same industry;

- Specific indicators that include a motivation for management to engage in fraudulent financial reporting;

- An excessive interest by management in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices;

- A practice by management of committing to analysts, creditors, and other third parties to achieve what appears to be unduly aggressive or clearly unrealistic forecasts;

- Domination of management by small group without compensating controls such as effective oversight by the board of directors or audit committee;

- Management failing to display an appropriate attitude towards internal controls and the financial reporting process;

- Claims against the entity or its senior management alleging fraud or violations of securities laws;

- Management setting unduly aggressive financial targets and expectations for operating personnel; and

- Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm.

72.    Here, PwC did not miss just one item or two items, but numerous items. There was not just one form of manipulation, but several, which PwC was aware of, or which PwC would have been aware of had it not recklessly ignored numerous red flags.

73.    PwC, as Huron's auditor, was obligated to assess Huron's internal disclosure, financial and accounting controls, and whether such controls had been placed in operation, were effective and complied with SOX, including controls to provide assurance about financial reporting, operations and compliance with regulations. PwC was required to evaluate whether poor controls might lead to or contribute to the risk that fraud might not be detected.

74.    Effective internal controls are essential to a company's financial reporting, as adequately designed internal controls provide a company with reasonable assurance on the reliability of financial reporting, the effectiveness and efficiency of operations, and compliance with applicable laws and regulations. AU §319.06. Under auditing standards, as set forth in AU §319.02:

> In all audits, the auditor should obtain an understanding of internal control sufficient to plan the audit by performing procedures to understand the design of controls relevant to an audit of financial statements and determining whether they have been placed in operation.

75.    If an auditor identifies any material weaknesses in a company's internal controls during an audit, then the auditor must communicate these weaknesses to the company's audit committee.  AU §325.  Further, the auditor should identify any limitations related to the internal control weaknesses in his or her audit opinion in accordance with the procedures proscribed by the professional standards.

76.    With respect to Huron's internal controls for 2006-2008, PwC represented in its Reports of Independent Registered Public Accounting Firm dated February 22, 2007, February 19, 2008 and February 24, 2009, that in its opinion the Company had maintained effective internal controls.

77.    Despite PwC's "clean" audit reports for 2006 through 2008 and its assessment as to the effectiveness of Huron's internal controls, Huron announced a significant restatement related to its acquisition accounting and an SEC inquiry into its revenue recognition.

78.    The reasons for Huron's restatement and the SEC inquiry involve periods during which Huron's financial results had been audited and/or reviewed by PwC and for which PwC had issued unqualified opinions and approved of Huron's publicly announced results.

79.    PwC's failure to adequately perform its audit procedures to identify the improprieties alleged herein and its failure to report the problems permitted the accounting irregularities and improprieties to continue over a period of several years, leading to false and misstated financial statements.  Due to PwC's false statements and failure to identify and modify its report to identify Huron's false financial reporting, PwC violated the following fundamental GAAS standards:

a.    The first general standard is that the audit should be performed by persons having adequate technical training and proficiency as auditors;

b.  The second general standard is that the auditors should maintain an independence in mental attitude in all matters relating to the engagement;

c.  The third general standard is that due professional care is to be exercised in the performance of the audit and preparation of the report;

d.  The first standard of field work is that the audit is to be adequately planned and that assistance should be properly supervised;

e.  The second standard of field work is that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed;

f.  The first standard of field work is that sufficient, competent evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit;

g.  The first standard of reporting is that the report state whether the financial statements are presented in accordance with GAAP;

h.  The second standard of reporting is that the report shall identify circumstances in which GAAP has not been consistently observed;

i.  The third standard of reporting is that informative disclosures are regarded as reasonably adequate unless otherwise stated in the report; and

j.  The fourth standard of reporting is that the report shall contain an expression of opinion or the reasons why an opinion cannot be expressed.

**FACTS THAT SUPPORT A COGENT INFERENCE OF SCIENTER**

80.   As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the

name of the Company were materially false and misleading; knew or recklessly disregarded that

such statements or documents would be issued or disseminated to the investing public; and

knowingly and substantially participated or acquiesced in the issuance or dissemination of such

statements or documents as primary violations of the federal securities laws.  As set forth

elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true

facts regarding Huron, their control over, and/or receipt and/or modification of Huron's

materially misleading misstatements and/or their associations with the Company which made

them privy to confidential proprietary information concerning Huron, participated in the

fraudulent scheme alleged herein.

81.    The sheer magnitude and extended time period of the restatements and accounting

improprieties as described herein could not have been unknown to Defendants.

82.    A strong inference of scienter is further supported by the Individual Defendants'

Class Period insider stock sales.  The Individual Defendants were highly motivated to conceal

the truth from Plaintiff and the investing public so that they could keep Huron's stock price as

high as possible, giving them an opportunity to sell their shares at the highest possible prices

before the bad news came out about the Company's accounting improprieties.  The Individual

Defendants took full advantage of the artificial inflation in the Company's stock price caused by

their material misrepresentations, making stock sales that were unusual and suspicious in timing

and amount of stock sold, as set forth in the tables below:

DEFENDANT GARY BURGE'S CLASS PERIOD STOCK SALES

| Transaction Date | Shares Sold | Transaction Price | Market Value |
|---|---|---|---|
| 07/01/09 | 776 | $46.72 | $36,255 |
| 07/01/09 | 1,724 | $46.72 | $80,545 |
| 07/01/09 | 2,936 | $46.67 | $137,023 |
| 10/13/08 | 1,116 | $50.37 | $56,213 |
| 07/02/08 | 2,891 | $46.47 | $134,345 |
| | 9,443 | | $444,381 |

DEFENDANT GARY HOLDREN'S CLASS PERIOD STOCK SALES

| Transaction Date | Shares Sold | Transaction Price | Market Value |
|---|---|---|---|
| 07/01/09 | 7,330 | $46.73 | $342,531 |
| 06/11/09 | 10,000 | $50.00 | $500,000 |
| 06/11/09 | 10,000 | $50.00 | $500,000 |
| 02/27/09 | 4,750 | $41.59 | $197,553 |
| 02/03/09 | 10,000 | $50.00 | $500,000 |
| 01/02/09 | 10,000 | $57.79 | $577,900 |
| 12/01/08 | 10,000 | $50.00 | $500,000 |
| 11/03/08 | 10,000 | $54.11 | $541,100 |
| 10/13/08 | 16,194 | $50.37 | $815,692 |
| 10/01/08 | 10,000 | $56.01 | $560,100 |
| 09/02/08 | 10,000 | $65.68 | $656,800 |
| 08/12/08 | 10,000 | $62.21 | $622,100 |
| 08/11/08 | 5,000 | $62.19 | $310,950 |
| 08/08/08 | 5,000 | $59.84 | $299,200 |
| 08/01/08 | 10,000 | $52.50 | $525,000 |
| 07/15/08 | 10,000 | $50.00 | $500,000 |
| 07/15/08 | 10,000 | $50.00 | $500,000 |
| 07/02/08 | 7,226 | $46.47 | $335,792 |
| 07/02/08 | 7,226 | $46.47 | $335,792 |
| 05/14/07 | 20,000 | $65.64 | $1,312,800 |
| 05/11/07 | 25,000 | $65.07 | $1,626,750 |
| 05/09/07 | 15,000 | $65.81 | $987,150 |
| 03/06/07 | 10,000 | $64.44 | $644,400 |
| 03/05/07 | 10,000 | $63.82 | $638,200 |
| 03/02/07 | 10,000 | $62.88 | $628,800 |
| 03/01/07 | 10,000 | $62.79 | $627,900 |
| 02/28/07 | 10,000 | $63.05 | $630,500 |
| 02/27/07 | 10,000 | $63.50 | $635,000 |
| | 292,726 | | $16,852,010 |

83.    While some of these stock sales were purportedly made pursuant to Rule 10b5-1

plans, this does not immunize these insider sales because at the time the Rule 10b5-1 plans were

instituted, the Individual Defendants knew or recklessly disregarded that Huron was issuing false

and misleading financial statements, and that when this information was disclosed, it would result in a sharp decline in the price of Huron's stock.

84.    The resignations of the Company's top executives without severance payments, including Defendants Holdren and Burge, further support a strong inference of scienter. This mass exodus of Huron executives occurred contemporaneous to the time that the accounting improprieties and restatement were revealed and supports an inference that these individuals were aware of the Company's improper accounting for earn-out payments and had engaged in the misconduct that necessitated the restatement.

85.    In addition, between the July 2008 acquisition of Stockamp & Associates, Inc. and January 2009, Defendants were motivated to misrepresent and conceal the fact that the Company's financial results had been misrepresented, as set forth herein, due to the fact that part of the consideration for that acquisition was Huron common stock, and if the value of that stock declined more than 5% between January 2008 and July 2009 the Company was obligated to pay the difference to Stockamp & Associates, Inc. in January 2009, in cash or stock (at Huron's election).

86.    The strong inference of scienter is further supported by Huron's need to recruit and retain highly sought after professionals. Because Huron was in the business of selling the services of highly sought after professionals , as the Company admitted in its SEC filings, including its 2008 10-K, that its success depended on its ability to attract and retain these professionals, stating:

> Our success depends on our ability to attract and retain highly talented professionals … we have adopted a comprehensive rewards program incorporating compensation, training and development opportunities, performance management and special recognition plans that motivates individual performance and promotes teamwork.

87.     Throughout the Class Period, Huron used lucrative stock-based compensation plans as currency to attract and retain these professional.  If the Company was unable to maintain the attractiveness of the price of its stock by maintaining the artificial inflation, then the Company would be unable to retain its professionals and its business would suffer.  As a result, Defendants were highly motivated to maintain the artificial inflation in the price of Huron stock.

88.     Based upon PwC's intimate knowledge of Huron, described above, PwC knew or recklessly disregarded from its observation of Huron's business, as well as the Company's disclosures in its SEC filings, that retention and motivation of key employees of acquired businesses were critical to the performance of those businesses.  In addition, PwC knew or recklessly disregarded that there was strong competition for the services of those employees, and that it was customary and necessary for such employees to receive substantial inducements to remain in the employ of the acquired businesses and to incentivize their performance.  Therefore, GAAS required PwC to investigate the existence of any inducements other than their remuneration from the Company, such as retention bonuses, to continue their employment with Huron and incentivize their performance with the Company which would be required under GAAP to be included in Huron's financial statements, as was the case with the payments made by the sellers of the acquired businesses.

89.     As is evidenced by the sheer size of the payments – $53 million – that were made to many employees by the sellers of four acquired companies pursuant to agreements between the sellers and those employees, their compensation absent such payment would not otherwise have reflected the amounts customary for inducements to retain such employees.  Therefore, PwC either failed to learn of these payments due to a reckless failure to conduct its audits in

accordance with GAAS or knew of the payments and knew that its opinions that Huron's financial statements were in conformity with GAAP were false.

## LOSS CAUSATION

90.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Huron's stock price and operated as a fraud or deceit on Class Period purchasers of Huron stock by misrepresenting the Company's financial results, as alleged herein. Defendants created Huron's façade of success, profitability and growth through accounting manipulations that include:

- Improperly accounting for earn-outs based on the performance of acquired business units after the transaction was completed, that were redistributed to Huron employees who were not parties to the original sale.  Such payments were based on the performance of the employees who remained at Huron, and not based on the ownership interests of those employees in the businesses that were sold to Huron.

- Huron was required to account for these employee compensation payments as noncash operating expenses of the Company, but instead it added these amounts to the purchase price of the acquisitions in the form of goodwill.

- This method of accounting for compensation payments had the effect of increasing reported net income, EPS and EBITDA.

91.    By misrepresenting Huron's Class Period financial results, Defendants presented a misleading picture of Huron's business condition and prospects.  Instead of truthfully disclosing during the Class Period that Huron's business was not as profitable as represented, Defendants caused Huron to falsely report financial results that did not accurately reflect the Company's true financial condition because they overstated net income, EPS and EBITDA.

92.     Defendants' claims of strong growth and profitability in addition to the claims that the financial results in the Company's SEC filings presented a true picture of Huron's financial condition caused and maintained the artificial inflation in the Company's stock price throughout the Class Period until the truth began to be revealed to the market.

93.     Defendants' false and misleading statements had the intended effect and caused Huron stock to trade at artificially inflated levels, reaching as high as $83.25 per share on December 26, 2007.

94.     On July 31, 2009 (after the markets closed), Huron issued a press release announcing that the Company intended to restate its financial results for the years ended December 31, 2006, 2007 and 2008 and the first quarter of 2009 due to improper accounting treatment of earn-out payments from four acquisitions.

95.     As a direct result of Defendants' disclosure that (contrary to Defendants' Class Period representations) the Company had substantially lower net income, earnings per share and EBITDA than it reported during the Class Period, the price of Huron stock immediately dropped $30.66 per share from a closing price of $44.35 per share on Friday, July 31, 2009 to a closing price of $13.69 per share on Monday, August 3, 2009, representing a 69%, single-day decline, on unusually heavy volume of 31.7 million shares traded.  Thus, as the truth about Defendants' fraud and Huron's business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and Plaintiff and other members of the Class were damaged, suffering economic losses.

96.     The decline in Huron's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Huron's stock price decline negates any inference that the loss suffered by Plaintiff and other

class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

97.     While the price of Huron stock fell 69% from $44.35 per share on Friday, July 31, 2009 to a closing price of $13.69 per share on August 3, 2009, the broader NASDAQ index actually went up, from 1,978.50 to close at 2,008.61 on August 3, 2009 (a 1.5% increase).  Thus, the damage suffered by Plaintiff and other members of the class was a direct result of Defendants' fraudulent scheme to artificially inflate Huron's stock price and the subsequent significant decline in the value of Huron's stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

98.     The foregoing allegations describe Plaintiff's general theory of damages, demonstrate that Plaintiff's damages were caused by the scheme to defraud as alleged herein, and negate any negative inference that Plaintiff's losses were the result of general market conditions or other factors wholly unrelated to the false and misleading information complained of herein. Upon further investigation and expert analysis, Plaintiff may assert that there were additional inflationary or corrective events that caused or contributed to the damages Plaintiff incurred.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

99.     At all relevant times, the market for Huron common stock was an efficient market for the following reasons, among others:

      a.  Huron common stock met the requirements for listing, and was listed and actively traded on the NASDAQ Global Select Market under the symbol "HURN," which is a highly efficient and technologically advanced equities market;

b.  As a regulated issuer, Huron filed periodic public reports with the SEC and the NASDAQ;

c.  According to the Company's Form 10-Q filed with the SEC on April 30, 2009, as of April 23, 2009 there were approximately 21,522,506 million shares of Huron' common stock outstanding;

d.  According to the Company's Form 10-K filed with the SEC on February 24, 2009, as of February 13, 2009, there were 33 holders of record of Huron's common stock;

e.  Huron regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

f.  According to Bloomberg, during the Class Period, Huron common stock had a high average weekly trading volume that ranged between approximately 502,384 and 10.12 million shares;

g.  During the Class Period, Huron was followed by numerous securities analysts employed by major securities research firms, including, but not limited to Avondale Partners LLC, Boenning & Scattergood Equity Research, Deutsche Bank Securities, JMP Securities, Pechala's Reports, Plunkett Research, Ltd., Rapid Ratings, Robert W. Baird & Co., Inc., Stifel Nicolaus & Company, Inc., Suntrust Robinson Humphrey, TheStreet.com Ratings, L.L.C., ValuEngine, Inc., William Blair & Company, and Zacks Investment Research Inc., who

regularly wrote reports that were distributed to certain customers of their respective brokerage and research firms.  Each of these reports was publicly available and entered the public marketplace;

h.   According to Bloomberg, Huron stock had approximately 22 market makers during the Class Period; and

i.   As demonstrated herein, there are "empirical facts" showing causation between corporate events or releases and an immediate response in the price of Huron stock.

j.   As a result of the foregoing, the market for Huron common stock promptly digested current information regarding Huron from all publicly available sources and reflected such information in Huron's stock price.

100.   Plaintiff and all other members of the Class purchased shares of Huron common stock at prices set by the market and did so in reliance on the integrity of those prices.  Under these circumstances, all purchasers of Huron common stock during the Class Period suffered similar injury through their purchase of Huron common stock at artificially inflated prices, and a presumption of reliance applies.

## NO STATUTORY SAFE HARBOR

101.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Huron who knew that those statements were false when made.

## CLASS ALLEGATIONS

102. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Huron during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

103. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Huron's common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Huron or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

104.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

105.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

106.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

a.   Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.   Whether the documents, reports, filings, releases and statements disseminated to the Class by Defendants during the Class Period misrepresented material facts about the business, performance and financial condition of Huron;

c.   Whether Defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein;

d.   Whether Defendants acted knowingly or with deliberate recklessness in misrepresenting material facts;

e.   Whether the market price of Huron common stock during the Class Period was artificially inflated due to the misrepresentations complained of herein; and

f.   To what extent the members of the Class have sustained damages and the proper measure of damages.

107.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I
### Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

108.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

109.   This Count is asserted against all Defendants named herein and is based upon violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

110.   During the Class Period,  Defendants, and each of them, directly engaged in a common plan, scheme and unlawful course of conduct, pursuant to which Defendants knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and other members of the class, and made various deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and the other members of the class.  The purpose and effect of the scheme, plan an unlawful course of conduct was, among other things, to induce Plaintiff and the other members of the class to purchase or acquire Huron stock during the Class Period at artificially inflated prices.

111.    During the Class Period, Defendants, pursuant to this scheme, plan an unlawful course of conduct, knowingly and recklessly issued, caused to be issued and participated in the issuance and preparation of deceptive and materially false and misleading statements to the investing public, as particularized above.

112.    As a result of the dissemination of the false and misleading statements set forth above, the market price of Huron stock was artificially inflated during the Class Period.   In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by Defendants, Plaintiff and the other members of the class relied, to their detriment, on the integrity of the market price of the stock in purchasing Huron stock.  Had Plaintiff and the other members of the class known the truth, they would not have purchased Huron stock or would not have purchased it at the inflated prices that were paid.

113.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they had a duty to promptly disseminate truthful information that would be material to investors, in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. §§210.01 *et. seq.*) and other SEC regulations, including truthful, complete and accurate information with respect to the Company's operations and performance so that the market price of the Company's publicly traded stock would be based on truthful, complete and accurate information.

114.    Plaintiff and other members of the class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

115. By reason of the foregoing, Defendants directly violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a coarse of business which operated as a fraud and deceit upon Plaintiff and the other members of the class in connection with their purchases of Huron stock during the Class Period.

116. As a direct and proximate result of the disclosure of the material facts that Defendants misrepresented and omitted during the Class Period, the artificial inflation that had entered the price of the Company's common stock during the Class Period was removed, causing Plaintiff and the other members of the class to suffer damages in connection with their purchases of Huron stock during the Class Period.

## COUNT II
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

117. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

118. The Individual Defendants acted as controlling persons of Huron within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various

statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

119.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

120.    As set forth above, Huron and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action and certifying Plaintiff as a class representatives under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred

in this action, including counsel fees and expert fees; and

d.  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 7, 2009

Respectfully submitted,

 /s/ Kenneth A. Wexler
Kenneth A. Wexler, Esq.
Mark R. Miller, Esq.
WEXLER WALLACE LLP
55 West Monroe St.
Ste. 3300
Chicago, IL  60603
Phone: (312) 346-2222
Fax: (312) 346-0022
E-mail: kaw@wexlerwallace.com
E-mail: mrm@wexlerwallace.com

*Liaison Counsel for Plaintiff*

Sherrie R. Savett, Esq.
Carole A. Broderick, Esq.
Eric Lechtzin, Esq.
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
Phone: (215) 875-3000
Fax: (215) 875-4604
E-mail: ssavett@bm.net
E-mail: cbroderick@bm.net
E-mail: elechtzin@bm.net

*Counsel for Plaintiff*

malta488900-008.doc